UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

GEORGE CABLE

v.

STARBUCKS CORPORATION; DOES 1-25.

CASE NO. 2:20-CV-10931-JLS-AS

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 66)**

1

Before the Court is Defendant Starbucks Corporation's Amended Motion for Summary Judgment.  (Mot., Doc. 66, Mem. Doc. 66-1.)  Plaintiff George Cable opposed, and Starbucks replied.  (Opp., Doc. 68; Reply, Doc. 69.)  The motion was taken under submission, and the matter was subsequently transferred to this Court.  (Docs. 70, 78.)  Having considered the papers and for the reasons stated herein, Starbucks's Motion is GRANTED IN PART and DENIED IN PART.

## I.  BACKGROUND

Plaintiff George Cable worked as a barista for Defendant Starbucks from September 15, 2003 to April 29, 2016, and then from June 2017 to November 22, 2019.  (Doc. 68-2 ¶ 1.)  On July 6, 2005, Cable sustained a workplace cervical spine injury while working for Starbucks and was placed on work restrictions where he was unable to do repetitive motions of the neck or prolonged or repetitive work with either arm at or above shoulder level. (Doc. 69-2 ¶ 46.)

On July 2, 2018, Cable told his new manager, Zhihui Ong, that he had workplace accommodations in place to not work more than four hours at a time and to not work back-to-back days or on weekends.  (Doc. 68-2 ¶ 11.)  Starbucks asserts that Cable also told Ong that he could not work more than ten minutes on bar without having to re-deploy, but Cable disputes this.  (*Id.*)  Cable's two prior managers did not receive medical documentation supporting his accommodations, but they had accommodated Cable's requests.  (*Id.* ¶ 12.)

Starbucks and Cable engaged in an interactive process regarding Cable's requested accommodations in the summer and fall of 2018.  Starbucks provided Cable with the requested accommodations while awaiting medical authorization.  (*Id.* ¶ 13.)   Cable provided an October 23, 2018 note from Dr. Allan Delman stating that Cable needed the following restrictions: "no frequent and repetitive head and neck movements; no overhead activity; no repetitive or continuous reaching or forceful pushing and pulling.  If these

2

restrictions cannot be adhered to with full-time work, then the patient should continue to be restricted to 4 hours a day and second day's work." (*Id.* ¶ 15.) Cable asserts that during phone calls with Partner Resources Support Center ("PRSC")[1] representative Sheila Schultz regarding these requested accommodations, Schultz told him that the accommodations in the doctor's note contradicted Starbucks policies, that Starbucks would not be able to accommodate his injuries, and that he would have to be terminated. (Doc. 68-1 at 334.) Cable further alleges that in "most" of his conversations with Schultz she made comments about his age, including that he was too old to work at Starbucks and that he was approaching the age where he could be other employees' grandparent, and she asked if he wanted it on his tombstone that the furthest he got in life was being a barista. (*Id.* at 358-59.) In emails regarding Cable's requested accommodations, District Manager Michael Koachway made the following comments: in an email from July 11, 2018 to Partner Resource Manager Tammie Mingus, he stated "But Z5 did say George has stated he plays hockey as a goalie, not sure how he can do that but not be on bar," (*Id.* at 39), and in an email from July 24, 2018 to Mingus, "Oh, and the kicker just saw him come in today and he rides a motorcycle to work (his regular mode of transportation). So how do you claim you cannot be on bar for more than 10mins yet can maneuver a several hundred-pound bike with no issue?" (*Id.* at 52.) Cable received the accommodations of not working more than four hours each day and not being scheduled for back-to-back shifts, and worked without issue through May 2019. (Doc. 68-2 ¶¶ 17, 19.)

In May 2019, a shift supervisor told Ong that Cable had indicated that he had work restrictions saying that he could not reach for things, though Cable disputes ever making such a statement. (*Id.* ¶ 17.) Cable told Ong that his hands would sometimes go numb, causing him to spill hot coffee, and Ong contacted the PRSC to open a new interactive dialogue. (*Id.* ¶ 18.) Starbucks engaged in a second interactive process with Cable, seeking medical authorization for any new restrictions. (*Id.* ¶ 19.) In an email to

---

[1] Starbucks refers to its employees as "partners."

3

Koachway, Schultz, and Mingus dated May 20, 2019, Ong wrote that while they were discussing accommodations Cable was "bringing up a workers comp case from the past and stated that people including [Schultz] is [sic] basically asking him to quit." (Doc. 68-1 at 81.) On May 30, 2019, Cable presented a note from Dr. Kenneth Ho with the following restrictions through December 1, 2019: light duty, limited reaching and pulling overhead, limited to four hours per workday, and no back-to-back days. (Doc. 68-2 ¶ 20.) Cable asserts that he informed Ong that the December 1 end date on the restrictions was merely because he was awaiting insurance approval to see an orthopedic specialist. (*Id.*) He asserts that his disability was permanent, and that he communicated this to Ong. (*Id.*) Starbucks accommodated the restrictions in Dr. Ho's note through December 1, 2019 and provided an additional work restriction Cable requested of "limiting continuous time on the bar to no more than one hour." (*Id.* ¶ 21.) When Cable could not work continuously on the bar making drinks, Ong or store manager Adam Brown would ensure that another barista could take over. (*Id.* ¶ 22.)

During this time period, Cable received two "corrective actions," i.e., disciplinary write-ups. The first was on July 18, 2018, purportedly for failure to adhere to the Starbucks time and attendance policy due to unexcused tardies. (*Id.* ¶ 32.) The second, which was a final written warning, was on October 27, 2018, purportedly for being 20 minutes late without calling in advance. (*Id.* ¶ 33.) Cable contends that these corrective actions were given not for the stated reasons but due to his engagement in the interactive process. (*Id.* ¶¶ 32-33.) On May 31, 2019, Koachway sent an email to Mingus and Ong, copying Schultz, informing them that Cable had been late to work that day, stating "[h]e is on a final and has not had an incident since he received it back 7 months ago." (Doc. 68-1 at 88.) Koachway continued, "[e]ssentially, next incident would be separation but I do know he is high risk so if any added insight you all would like to provide, please do." (*Id.*)

On October 21, 2019, Cable witnessed an individual attempt to steal the tip jar at his store while he was working. (Doc. 68-2 ¶ 4.) In a handwritten statement describing

the incident that Cable wrote on November 1, 2019, Cable stated that he saw the person take the tip jar and he "calmly walked around the counter and took the tip jar back, set it on the counter, then grabbed his hand that had a fist full of cash forcing him to drop the cash. I then walked him out of the store." (Doc. 67-2 at 20.) In his deposition, Cable asserted that he was rushed while writing the statement, and that his "holding [the man's] hand didn't force him to drop the cash." (Doc. 68-1 at 401.)

The Starbucks Safety and Security Manual includes instructions as to how employees should respond to the store being robbed, and to people shoplifting. In the section entitled "Robbery and Burglary," employees are instructed to "[c]ooperate with the robber's reasonable demands," and are told "[d]o not physically resist the robber" and "[d]o not be a hero!" (Doc. 66-3 at 121.) In the section entitled "Shoplifting/Disruptive customers," employees are told "[d]o not position yourself between the shoplifter and the door," "DO NOT ACCUSE THE SHOPLIFTER," and "[d]o not chase the shoplifter." (*Id.* at 125.) Regarding disruptive customers, employees are instructed to "[e]ngage the customer in conversation and ask that he/she stop his/her specific disruptive behavior. If his/her behavior continues, ask him/her to leave." (*Id.* at 124.) They are further instructed to "[m]aintain [their] distance from a disruptive or combative customer." (*Id.*) Cable completed Robbery Prevention and Incident Response Training and does not dispute that he knew he was not permitted to physically stop a robbery. (Doc. 68-2 ¶ 3.)

Koachway and Mingus conducted an investigation into whether Cable violated Starbucks policy in stopping the theft and what level of discipline should be imposed. (Doc. 68-2 ¶ 6.) They consulted with PRSC representatives Ashley Pasqualetti and Sheila Schultz. (*Id.*) Pasqualetti initially recommended a corrective action of "documented coaching, centered around the fact that George's safety is paramount to us," and not a termination, in an email on October 28, 2019 to Brown. (*Id.* ¶ 7; Doc. 68-1 at 106.) A week later, in electronic messages with Mingus on November 5, 2019, Pasqualetti stated "I calibrated with the team, and don't feel separation is warranted but if [Koachway] wants to

5

– totally his call." (Doc. 68-1 at 121.) In an email to Schultz on November 11, 2019, Mingus wrote:

> We had the below customer incident called in, which was pretty mildly described in which a partner prevented someone from stealing their tips. After digging in, the SM/DM have discovered that the partner walked around the counter and grabbed the person by the wrist, made them drop the money and escorted them outside – this by the partner's own admission. A witness partner statement was that he heard the partner yelling at the man as well. Initial recommendation was a documented coaching (granted, we hadn't received the partner witness statements yet), but I believe we have separated partners in the past for this type of behavior. We are unable to pull video for this, which might give a clue into the partner's demeanor and body language.
> I don't want to go against PRSC recommendation and be unfairly harsh, but would also like to understand what I'm potentially missing in this. I would appreciate your input and thoughts.

(Doc. 67-2 at 66.) In a deposition, Schultz said she told Mingus that "if the partner had put hands on a customer and physically forced them out of the store, that the outcome would consistently be separation of employment" and that termination "would be appropriate because that's the action we've taken in same and similar circumstances." (Doc. 66-4 at 50-51.)

On November 22, 2019, Koachway terminated Cable's employment. (Doc. 68-2 ¶ 9.)

Cable filed this action in Los Angeles County Superior Court on October 28, 2020. (Doc. 1-1.) Starbucks removed to the Central District on December 1, 2020. (Doc. 1.) Starbucks moves for summary judgment as to all of Cable's claims.[2]

---

[2] Starbucks requests to strike facts and evidence that it argues were added to Cable's Opposition in violation of a prior court order, and to strike Cable's entire Opposition on the same
(footnote continued)

6

## II.     LEGAL STANDARD

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is proper "if the [moving party] shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-moving party's favor, and a fact is "material" when it might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248. But "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

The role of the Court is not to resolve disputes of fact but to assess whether there are any factual disputes to be tried. The moving party bears the initial burden of demonstrating the absence of a genuine dispute of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Once the moving party carries its initial burden, the adverse party 'may not rest upon the mere allegations or denials of the adverse party's pleading,' but must provide affidavits or other sources of evidence that 'set forth specific facts showing that there is a genuine issue for trial.'" *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Fed. R. Civ. P. 56(e)).

---

basis. (Doc. 69-3.) The Court has either not relied on these materials or ensured that the underlying evidence supporting the facts was included in the original motion and did not constitute "new legal argument[]," "new evidence," or a "[s]ignificant substantive change[] or adjustment." (*See* Order, Doc. 63 at 4.) Accordingly, the request is DENIED.

### III. DISCUSSION

Starbucks argues that it terminated Cable because of the tip jar incident, and not for any discriminatory reason. It argues that there is no genuine dispute of material fact as to any of Cable's claims.

#### A. Disability Discrimination

Under FEHA, it is unlawful "[f]or an employer, because of . . . physical disability . . . of any person . . . to discharge the person from employment." Cal. Gov't. Code § 12940(a). In FEHA disability discrimination cases, courts apply the three-step analysis set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 354 (2000). The plaintiff must first make a prima facie showing of discrimination. *McDonnell*, 411 U.S. at 802. The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* The burden then shifts back to the plaintiff to show that the employer's proffered explanation is merely a pretext for a discriminatory motive. *Id.* at 804. To establish a prima facie case of disability discrimination under FEHA, the plaintiff must show (1) that the plaintiff suffers from a disability; (2) that the plaintiff is otherwise qualified to do his job; and (3) that the plaintiff suffered an adverse employment action because of his disability. *Faust v. Cal. Portland Cement Co.*, 150 Cal. App. 4th 864, 886 (2007). After an employer has proffered a legitimate, nondiscriminatory reason for the adverse action, in order to avoid summary judgment, a plaintiff must "offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 75 (2000). Under FEHA, discrimination need not be the but-for cause of the adverse employment action, but must be a "substantial factor motivating" it. *Harris v. City of Santa Monica*, 56 Cal. 4th 203, 225 (2013). "Because of the similarity between state

and federal employment discrimination laws, California courts look to pertinent federal precedent when applying [their] own statutes." *Guz*, 24 Cal. 4th at 354.

Starbucks argues that Cable cannot make the prima facie showing of disability discrimination because Starbucks gave him all of his requested accommodations and that there is no evidence that Starbucks's rationale for terminating Cable was pretextual. (Mem. at 20-22.). Cable argues that he has made a prima facie case of disability discrimination and that circumstantial evidence creates a triable issue of fact for the jury that Starbucks's stated reason for firing him was pretextual. (Opp. at 15-22.)

The Court agrees that the evidence in the record is sufficient to establish a prima facie case and that, taking all of Cable's evidence as true and drawing all inferences in his favor, a rational factfinder could conclude that Starbucks's stated reason for terminating Cable was pretextual and its decision to fire Cable was substantially motivated by his disability. The facts here show that at least four individuals were involved in Cable's termination: Koachway, Schultz, Mingus, and Pasqualetti. Pasqualetti—the only one who was not involved in the interactive process related to Cable's disability—initially recommended against termination, and reiterated that she felt termination was unwarranted after "calibrat[ing] with the team." Cable argues that he did not clearly violate either Starbucks's robbery and burglary policy, nor its shoplifting and disruptive customer policy, and that there are no specific policies in place as to what Starbucks employees should do when their own tips are being stolen. (Opp. at 18-19.) In emails discussing Cable's requested accommodations in July 2018, Koachway expressed skepticism that Cable actually needed the accommodations based on his activities outside of work, including riding a motorcycle and playing hockey. Cable alleges that Schultz told him during the interactive process that the accommodations he requested were not workable for Starbucks and that he would have to be terminated. Before going into the interactive process, Cable had no corrective actions since going back to work at Starbucks in 2017, and his overall performance rating within his performance reviews since 2004 indicated

9

that he always met or exceeded expectations.  (Doc. 69-2 ¶¶ 44-45.)  He then received two corrective actions, one in July 2018 and one in October 2018.  Both of these corrective actions coincided with discussions of Cable's requested accommodations.  (*Id.* ¶ 48.)  Cable has introduced evidence that such disciplinary actions can be subjective and discretionary.  (*Id.* ¶ 50.)  In an email in May of 2019, after Cable and Starbucks had reengaged in the interactive process, Koachway stated that Cable would be terminated for his next lateness violation, but that Cable was "high risk."  Starbucks policies do not require termination for violations of safety and security policies.  (*Id.* ¶ 63.)  A reasonable factfinder could conclude from this evidence that Koachway and Schultz did not want to accommodate Cable's disability, were looking for a reason to terminate his employment that would not implicate his disability, and seized on the tip jar incident to fire him where they otherwise would not have.

Moreover, Starbucks asserts that "[o]ther partners who engaged in the same conduct as Plaintiff's were similarly terminated."  (Doc. 66-2 ¶ 10; *see also* Mem. at 22-23.)  In support, it cites to Schultz's deposition where, when asked to describe other incidents where Starbucks employees were terminated for touching a customer, she stated: "[a]ny incident where a person puts themselves and others and the customer at risk, whether that's grabbing someone, hitting someone, chasing them out of the store, physically harming a person, physically pushing a person."  (Doc. 67-2 at 90-91.)  Starbucks has not introduced any evidence of specific occasions where employees were terminated for conduct similar to Cable's.  It is, of course, Cable's burden to demonstrate that he was treated differently than similarly situated employees.  *See Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258-59 (1981).  However, a factfinder could conclude that Schultz's assertion to the other decisionmakers that Cable's termination would be consistent with what Starbucks had done in similar circumstances, when evaluated against her failure at deposition—and Starbucks's failure in this motion—to provide a single instance of another termination in analogous circumstances is further circumstantial evidence of pretext.

10

Starbucks correctly points out that much of this evidence, in isolation, would be insufficient to create a triable issue as to discrimination. It argues that Koachway's comments were not discriminatory merely because they reference Cable's accommodations, were simply "stray remarks," and were too attenuated to be considered because they were made sixteen months prior to Cable's termination. (Reply at 6-7.) However, the California Supreme Court has rejected the use of the "stray remarks" doctrine to categorically disregard statements made outside the context of an employment decision or by a non-decision-maker, cautioning that courts must instead consider evidence of discriminatory comments alongside all of the other evidence in the record. *See Reid v. Google, Inc.*, 50 Cal. 4th 512, 538 (2010). Similarly, it is true that a "mere coincidence of timing" between the corrective actions and discussions regarding Cable's accommodations does not, by itself, permit a reasonable inference of discrimination. *See Day v. Sears Holding Corp.*, 930 F. Supp. 2d 1146, 1188 (C.D. Cal. 2013). Starbucks correctly argues that, even if Cable can show he actually did not violate Starbucks policy regarding the tip jar incident, that alone would not be sufficient evidence of discrimination because all that is necessary is that Starbucks "honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (quotations omitted). Taken all together, however, Cable's evidence is sufficiently substantial to permit a reasonable factfinder to find that Starbucks's stated reason for the termination was false, and that Starbucks discriminated against Cable on the basis of his disability. Summary judgment is therefore DENIED as to Cable's employment discrimination claim.

### B. Age Discrimination

To establish a prima facie case of age discrimination pursuant to FEHA, a plaintiff "must show he was (1) at least forty years old, (2) performing his job satisfactorily, (3) discharged, and (4) either replaced by substantially younger employees with equal or inferior qualifications or discharged under circumstances otherwise giving rise to an

11

inference of discrimination." *Merrick v. Hilton Worldwide, Inc.*, 867 F.3d 1139, 1146 (9th Cir. 2017) (quotations omitted). The *McDonnell Douglas* burden-shifting framework then applies. *Id.* at 1145.

Starbucks first argues that Cable has not made a prima facie case for age discrimination because he has not provided evidence of circumstances suggesting a discriminatory motive in the termination. (Mem. at 23.) It then contends that it has proffered a legitimate reason for terminating Cable, the tip jar incident, and Cable has not offered sufficient evidence to demonstrate that this reason was a pretext for age discrimination. (Mem. at 24.) Cable points to comments he alleges Schultz made regarding his age, including that he was nearing the age that he could be a partner's grandparent, asking whether he wanted "Starbucks barista" on his tombstone, and that he was too old to work at Starbucks. (Opp. at 24; Doc. 68-1 at 359.) Cable has alleged that Schultz made these comments "very frequently in most of the conversations that [he and Schultz] had." (*Id.*) He further argues that Schultz was consulted regarding his termination, and Schultz advocated for termination. (Doc. 68-2 ¶¶ 6, 8.) Last, Cable argues that, out of the 177 employees who worked at the store where Cable worked from 2015 to present, only 12 (including Cable) were over 40 years old, and that, of the 46 employees over the age of 40 in the district where Cable worked in the same time period, eight were terminated. (Opp. at 24.)

As to Cable's statistical evidence, the Court agrees with Starbucks that it is not probative of discrimination. Cable's evidence that 8 out of 46 employees over the age of 40 in his district were terminated is not, by itself, informative because he does not offer a comparator of what proportion of employees under the age of 40 were terminated in that time frame – a factfinder would be left to guess as to whether an approximately 17% termination rate is normal, abnormally high, or abnormally low. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1283 (9th Cir. 2000) ("To establish a prima facie case based solely on statistics, let alone raise a triable issue of fact regarding pretext, the statistics

12

must show a stark pattern of discrimination unexplainable on grounds other than age." (quotations omitted)).  His evidence that only 12 of 177 employees at the store where he worked were over 40 is similarly insufficient at the summary judgment stage; Cable makes no attempt to determine or account for variables other than age that might explain the disparity, or to compare this percentage to other Starbucks stores or similar businesses. *See Pottenger v. Potlach Corp.*, 329 F.3d 740, 748 (9th Cir. 2003) ("[T]his court and others have treated skeptically statistics that fail to account for other relevant variables." (collecting cases)).  Cable's simplistic statistics, lacking any comparator data or analysis of other explanatory variables, do not create a genuine dispute of material fact.

As to the alleged comments by Schultz, a plaintiff alleging discrimination must show both "discriminatory animus" and "evidence of a causal relationship between the animus and the adverse employment action." *DeJung v. St.*, 169 Cal. App. 4th 533, 550 (2008).  The *DeJung* court explained that "there is no need to engage in [the *McDonnell Douglas*] burden-shifting analysis where there is direct evidence of discriminatory animus." *Id.*  Further, under California law, it is not necessary for a plaintiff to "demonstrate that every individual who participated in the [adverse employment action] shared discriminatory animus in order to defeat a summary judgment motion." *Id.* at 551.  Rather, "showing that a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory." *Id.*

The Court first considers whether, taking Cable's allegations as true and drawing all reasonable inferences in his favor, Schultz's comments were evidence of discriminatory animus.  Starbucks argues that they are merely ambiguous, stray remarks, citing cases where allegedly discriminatory comments were insufficient to overcome summary judgment.  *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 915, 919 (9th Cir. 1996) (finding comment by supervisor that he intended to "get rid of all the old timers" was "ambiguous" and "weak evidence and not enough to create an inference of age

13

discrimination"); *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (finding statement "we don't necessarily like grey hair" was "at best weak circumstantial evidence of discriminatory animus toward" the plaintiff and the statement "we don't want unpromotable fifty-year-olds around" was "very general" and "did not relate in any way … to the terminations of" plaintiffs); *Cozzi v. Cnty. of Marin*, 787 F. Supp. 2d 1047, 1059 (N.D. Cal. 2011) (finding comment that employer wanted "fresh faces" and "fresh new faces" not "necessarily an age-based comment").  Schultz's statements that Cable was nearly old enough to be the other employees' grandparent, and questions about whether he wanted barista on his tombstone are somewhat ambiguous.  Merely noting his age does not necessarily evince discriminatory intent, and the comment about the tombstone could be read as an unkind taunt about Cable's career achievement, not his age.  However, it is difficult to see how the statement that Cable was too old to work at Starbucks could be read as anything other than discriminatory on the basis of age.  Schultz is a human resources representative, and the conversations where she allegedly made the comments were discussions about Cable's accommodations, and, therefore, his continued employment.  Accordingly, these comments are direct evidence of discriminatory animus.

       Mingus solicited Schultz's input on what should be done about the tip jar incident.  In her deposition, Schultz stated that she told Mingus that termination "would be appropriate because that's the action we've taken in same and similar circumstances." (Doc. 66-4 at 51.)  Thus, even if Koachway was the ultimate decision maker, Schultz was a "significant participant" in the decision to terminate Cable.  *See DeJung*, 169 Cal. App. 4th at 551.  Summary judgment is not appropriate where, as here, Cable has adduced evidence of discriminatory animus by a significant participant in the adverse employment decision.  Accordingly, summary judgment is DENIED as to Cable's age discrimination claim.

### C. Failure to Accommodate and Failure to Engage in the Interactive Process

Under FEHA, it is unlawful for an employer to "fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." Cal. Gov't Code § 12940(m). To establish a failure to accommodate claim, a plaintiff must show that "(1) the plaintiff has a disability covered by the FEHA; (2) the plaintiff is a qualified individual (i.e., he or she can perform the essential functions of the position); and (3) the employer failed to reasonably accommodate the plaintiff's disability." *Cuiellette v. City of L.A.*, 194 Cal. App. 4th 757, 766 (2011) (citation omitted). FEHA also requires employers to "engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by the employee." Cal. Gov't Code § 12940(n).

Cable first argues that Starbucks failed to accommodate him because it fired him eight days before it would have had to reengage with the interactive process regarding his accommodations. He also appears to argue that Starbucks failed to accommodate him because it instituted temporary, rather than permanent, work restrictions and because it did not transfer him to a different store that could more easily accommodate his schedule. (Opp. at 25-26.)

Starbucks has introduced uncontroverted evidence that Cable received all of the accommodations indicated in his doctor's notes in both the 2018 and 2019 interactive processes (not working for more than four hours in a day and working only every other day), with an additional accommodation of not having to work the bar for more than an hour added in the second interactive process. (Doc. 68-2 ¶¶ 15, 17, 19-21.) Cable's evidence that he was told by Schultz during the interactive process that he would not be able to be accommodated is irrelevant, where, as here, he agrees he received the accommodations. He does not introduce any evidence that his schedule of working every other day and for only four hours at a time was not accommodated, so there is no basis for his argument that failure to transfer him to another store that could more easily

15

accommodate his schedule was required. Simply put, Cable has not set forth evidence of any requested accommodation that he was denied.[3] As to Cable's argument that Starbucks unreasonably gave him temporary rather than permanent accommodations after the second interactive process, he does not dispute that the note he presented from Dr. Ho provided for restrictions only through December 1, 2019. (Doc. 68-2 ¶ 20.) He has cited no authority to support his position that providing temporary accommodations, where medical documentation provides for restrictions through a certain date, constitutes a failure to accommodate.

However, Starbucks does not dispute that, had Cable not been fired on November 22, 2019, his interactive process would have begun again on December 1, 2019. (Doc. 69-2 ¶ 74.) As discussed above, Cable has adduced sufficient evidence at this stage for his disability discrimination claim. Thus, there is sufficient evidence in the record to preclude summary judgment on his failure to accommodate claim. *See Moore v. Regents of Univ. of Cal.*, 248 Cal. App. 4th 216, 243-44 (2016) (explaining that pretextual termination "in lieu of providing reasonable accommodation or engaging in the interactive process does not provide an employer a reprieve from claims for failure to accommodate and failure to engage in the interactive process"). Accordingly, summary judgment is DENIED as to Cable's failure to accommodate claim.

Cable relies on the same facts for his failure to engage in the interactive process claim that he does for his failure to accommodate claim. (Opp. at 26.) While, as explained above, the record shows that Starbucks engaged in the interactive process twice with Cable, this claim survives summary judgment for the same reasons as the failure to accommodate claim.

---

[3] Cable argues that his accommodations were not made by pointing to the November 6, 2018 PRSC notes of his interactive process where it is recorded that he stated that "putting the coffee out to customers where they can get it, like handing it to them, is a problem for me" but directly after that note, it states that Cable said he could do it if it is for four hours at a time. (Doc. 68-1 at 74.) Cable has not argued that he was made to work for more than four hours at a time.

### D. Retaliation

FEHA makes it unlawful "[f]or any employer … to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under [FEHA] or because the person has filed a complaint, testified, or assisted in any proceeding under [FEHA]." Cal. Gov't Code § 12940(h). It makes it unlawful "in addition to the employee protections provided pursuant to subdivision (h)," to "retaliate or otherwise discriminate against a person for requesting accommodation under this subdivision, regardless of whether the request was granted." *Id.* § 12940(m)(2). To establish a prima facie case of retaliation under FEHA, a plaintiff must establish that (1) he engaged in a protected activity, (2) the employer subjected him to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. *Day*, 930 F. Supp. 2d at 1176. "In assessing the viability of FEHA retaliation claims in the context of motions for summary judgment, California courts apply the same burden-shifting analysis" discussed in the preceding sections. *Id.*

Cable points to two pieces of evidence to support his claim: that he was given corrective actions while undergoing the interactive process, and that when he complained to Ong that Schultz was asking him to quit, there was no investigation into his allegations. (Opp. at 27-28.) As for his complaint to Ong that Schultz was asking him to quit in the interactive process, Cable has adduced no evidence other than the timing of his complaint, six months prior to his firing, connecting the complaint to his termination. This is not sufficient at summary judgment. *See Govan v. Sec. Nat. Fin. Corp.*, 502 F. App'x 671, 674 (9th Cir. 2012) (affirming grant of summary judgment on retaliation claim where the "two events were more than six months apart—too distant to support an inference of causation based on timing alone").

As to Cable's claim that he was retaliated against for seeking accommodations, Starbucks's only argument is that seeking accommodations is not itself protected activity, citing *Moore*, 248, Cal. App. 4th at 247. (Mem. at 27.) However, as the court in *Moore*

17

made clear, a prospective amendment to FEHA post-dating the facts of that particular case made retaliation against employees for seeking accommodations unlawful. *Id.* at 245-47 ("[I]n passing Assembly Bill 987, the Legislature intended to *change* the law, not clarify it."). The 2015 amendments to FEHA are clearly applicable to this case. Counsel are reminded of their Rule 11 obligation to ensure that their "claims, defenses, and other legal contentions are warranted by existing law." Fed. R. Civ. P. 11(b)(2). As Starbucks's only argument regarding Cable's retaliation claim pertaining to accommodations is based on outdated case law, summary judgment is DENIED as to Cable's retaliation claim.

### E. Failure to Prevent Discrimination and Retaliation and Wrongful Termination in Violation of Public Policy

Starbuck's only argument as to Cable's failure to prevent discrimination and retaliation and wrongful termination claims is that they are derivative of his FEHA claims and should fail for the same reasons. (Mem. at 28.) As the Court denied summary judgment on Cable's disability and age discrimination claims and his retaliation claim, summary judgment is similarly DENIED as to these claims.

### F. Punitive Damages

The California Supreme Court has held that "in a civil action under the FEHA, all relief generally available in noncontractual actions, including punitive damages, may be obtained." *Commodore Home Sys., Inc. v. Superior Court*, 32 Cal. 3d 211, 221 (1982). Punitive damages are available for violations of FEHA "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice . . . ." Cal. Civ. Code § 3294(a). Under California law, however, an employer may not be held liable for punitive damages based upon the acts of its employees unless the employer (1) "had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others," (2) "authorized or ratified the wrongful conduct for which the damages are awarded," or (3) "was personally guilty of oppression, fraud, or malice." *Id.* § 3294(b).

"With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." *Id.* The term "managing agent" is meant "to include only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy." *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 566–67 (1999). Corporate policy includes policies that "affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership." *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 715 (2009). "It is this sort of broad authority that justifies punishing an entire company for an otherwise isolated act of oppression, fraud, or malice." *Id.*

Starbucks argues that summary judgment as to punitive damages is here appropriate because none of the alleged unlawful conduct was committed by an officer, director, or managing agent. Cable argues that there is sufficient record evidence to support a finding that both Koachway and Schultz are managing agents. (Opp. at 28-31.) Koachway, Cable argues, oversaw a district that included 300 hourly employees, had authority to hire, fire, and transfer employees, and was responsible as a district manager for setting goals for his district, creating strategic and operational plans, and developing district-level strategies for achieving various goals. (*Id.* at 29-30.) Cable argues that Schultz is a managing agent because she has the authority to recommend termination, even where another PRSC consultant has recommended differently, and "provides input and works on policies related to employment" as "part of the project team that creates employment policies at Starbucks." (*Id.* at 30-31)

As to Koachway's power to terminate Cable and Schultz's ability to recommend termination, a managing agent is not simply "any supervisor who can hire or fire employees." *White*, 21 Cal. 4th at 575. Similarly, that Koachway supervised 300 employees does not make him a managing agent. *See Muniz v. United Parcel Serv., Inc.*,

19

731 F. Supp. 2d 961, 976 (N.D. Cal. 2010) (finding operations manager that was "in charge of 6 divisions, 23 package centers and approximately 40 managers, 150 supervisors and 4,200 employees" was not a managing agent). Rather, there must be evidence that Koachway and Schultz "exercise substantial discretionary authority over decisions that ultimately determine corporate policy." *CRST, Inc. v. Superior Ct.*, 11 Cal. App. 5th 1255, 1273 (2017) (quotations omitted). "The key inquiry thus concerns the employee's authority to change or establish corporate policy." *Id.* As to Koachway, Cable's evidence is insufficient. The evidence that Koachway developed strategies and plans to ensure the profitability of the stores within his district does not show that he has substantial discretionary authority over Starbucks's policies. There is no evidence in the record that would permit a reasonable factfinder to conclude that Koachway's supervision of his district was a "significant aspect of [Starbucks's] business." *White*, 21 Cal. 4th at 577. Similarly, Cable's evidence that Schultz was part of a "project team" updating employment policies does not demonstrate her substantial authority to change corporate policy at her discretion. Accordingly, summary judgment is GRANTED as to Cable's claim for punitive damages.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED as to punitive damages and DENIED in all other respects.

DATED: March 24, 2023

_____
HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE